UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| JENAIL BROWN, JEREMY CARTWRIGHT, JEFFREY CLAYTON, WILLIAM CORDELL, BRYAN CORDREY, PHILIP DAVIS, SEAN DUPREE, JAMES ELLIOTTE, FRANKIE GALINDEZ, RONALD GRINE, CHRISTOPHER KING, JAPHIS LAMPKINS, GEORGE LEIFHEIT, JOHN MAYHEW, JAMES McCARDELL, JEFFERY McCRAY, GARY PALMER, RICHARD PANDISCIO, STEPHEN PARSONS, JOHN TAYLOR, JOSEPH WALLS, ADAM WENZKE, FRANK WHALEN JR., and ROBERT WORLEY on behalf of themselves and others similarly situated | |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **TRIAL BY JURY DEMANDED** |
| v. | |
| CENTURIAN OF DELAWARE, LLC, CORRECT RX PHARMACY SERVICES, INC., MONROE HUDSON, MICHAEL RECORDS, AWELE MDUKA-EZEH, SHERI L. MCAFEE-GARNER, VICTOR A. HERESNIAK, EMILIA ADAH, CHARLES REINETTE, FLORA A. ATANGCHO, BARBARA DENKINS, CARLA MILLER, WILLIAM F. NGWA, FEEAH M. STEWART, and JANE OR JOHN DOES 1 – 50. | |
| | |
| Defendants. | |

## PRELIMINARY STATEMENT

This is a civil rights action brought on behalf of a putative class of prisoner patients in the care and custody of the Delaware Department of Corrections. Each putative class member suffers from chronic pain and/or serious neuropathy which affects his/her daily function. These patients' medical conditions and symptoms were effectively treated with certain medications – including, but not limited to opioids, opiates, neuromodulators, and muscle relaxers – for years which controlled chronic pain and improved function. In 2019, Defendants implemented a policy which demanded the discontinuation of these medications that they deemed to have "abuse potential" in the prison environment. Patients were discontinued from effective treatment without regard for individualized need based on generalized assumptions of abuse potential not grounded in evidence, individualized patient circumstance, or the standard of care in the community or even other correctional environments. Putative class members have needlessly suffered in contravention of the protections of the Eighth Amendment. Plaintiffs respectfully request injunctive and declaratory relief as well as compensation for their unnecessary suffering and the violation of their rights secured by the U.S. Constitution.

## JURISDICTION AND VENUE

1.      This action arises under 42 U.S.C. § 1983, *et seq*.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a)(3)-(4).

3.      The acts complained of occurred in the District of Delaware. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

4.      Plaintiffs demand trial by jury in this action.

## THE PARTIES

### Defendants and State Actors

5.      **The Delaware Department of Corrections** ("DDOC") is responsible for the confinement and rehabilitation of approximately 4,600 individuals in its custody at approximately 9+ state facilities.

6.      The DDOC is responsible for the medical care of all inmates in its custody.

7.      The DDOC receives state and federal financial assistance.

8.      Claire DeMatteis served as the Commissioner of the DDOC through 2021.

9.      **Monroe Hudson** ("Defendant Hudson") is now the Commissioner of the DDOC. He is sued in his official capacity for injunctive and declaratory relief purposes.

10.     **The Bureau of Healthcare, Substance Abuse, and Mental Health Services** ("BHSAMH"), an agency within the DDOC, is tasked with ensuring adequate medical and mental health care within DDOC facilities.  BHSAMH contracts healthcare services to outside healthcare providers.

11.     **Michael Records** ("Defendant Records") has served as the Bureau Chief of the BHSAMH since 2020.  He is sued in his official capacity for injunctive and declaratory relief

purposes.

12.    **Awele Mduka-Ezeh** ("Defendant Mduka-Ezeh") has served as the Medical Director for BHSAMH since at least 2019.  She is sued in her official capacity for injunctive and declaratory relief purposes.

13.    **Connections Community Support Programs** ("Connections") was the contracted healthcare provider for DDOC between June 2014 and March 31, 2020.

14.    Connections filed for Chapter 11 bankruptcy reorganization on April 19, 2021.

15.    **Centurion of Delaware, LLC** ("Centurion") is a domestic limited liability company and a subsidiary of Centene Corporation.  Centurian is based in Vienna, Virginia.

16.    Centurian is the current contracted healthcare provider for DDOC having succeeded Connections on April 1, 2020.  Pursuant to its contract, DDOC, an agency of the state of Delaware, delegated responsibility for providing constitutionally adequate health care to prisoners in DDOC custody to Centurian.

17.    Centurian professes to meet the standards and treatment guidelines set by both the National Commission on Correctional Healthcare (NCCHC) and the American Correctional Association (ACA).

18.    **Correct RX Pharmacy Services, Inc.** ("CRX") is a Maryland corporation that has served as the pharmacy contractor for DDOC since 2014.  Pursuant to its contract, DDOC, an agency of the state of Delaware, delegated responsibility for providing pharmaceuticals to prisoners in DDOC custody to CRX.

19.    Centurian employs on-site providers, including physicans ("MD"), nurse practitioners ("NP") and physicians assistants ("PA") (collectively "Providers") in each Delaware prison to supply medical services.

20.    **Sheri L. McAfee-Garner, NP** ("Defendant McAfee-Garner") is a doctor of nursing practice who works for DDOC and Centurian.

21.    **Victor A. Heresniak, D.O.** ("Defendant Heresniak") is a doctor of osteopathic medicine who works for DDOC and Centurian.

22.    **Emilia Adah, MD** ("Defendant Adah") is a physician who works for DDOC and Centurian.

23.    **Charles Reinette, NP** ("Defendant Reinette") is a nurse practitioner who works for DDOC and Centurian.

24.    **Flora A. Atangcho, NP** ("Defendant Atangcho") is a nurse practitioner who works for DDOC and Centurian.

25.    **Barbara Denkins, NP** ("Defendant Denkins") is a nurse practitioner who works for DDOC and Centurian.

26.    **Carla Miller, NP** ("Defendant Miller") is a nurse practitioner who works for DDOC and Centurian.

27.    **William F. Ngwa, NP** ("Defendant Ngwa") is a nurse practitioner who works for DDOC and Centurian.

28.    **Feeah M. Stewart** ("Defendant Stewart") is a nurse practitioner who works for DDOC and Centurian.

29.    **Jane or John Does #1 - #50** are providers who work for DDOC and Centurian.

30.    **Consultants and Specialty Medical Providers** ("Specialists") are medical professionals who serve as outside specialists for the DDOC at area hospitals, emergency rooms, and specialty offices. Patients are sent to them for specialty assessment and treatment because the DDOC and Centurian doctors and specialists do not possess the requisite expertise to treat

the referred patient.

## FACTUAL HISTORY – HOW HEALTH CARE IS ADMINISTERED

**Medical Policy Development in DDOC**

31.   According to DDOC Policy No. A-02, the Bureau Chief of BHSAMH is responsible for "developing policies for the health care system."

32.   BHSAMH also maintains a Policy Review Committee, responsible for reviewing all policies at least once annually.  All policies are then signed by the Bureau Chief.

33.   The Policy Review Committee is chaired by the BHSAMH Director of Policy and Standards Compliance and includes a number of members, including Centurion personnel.

34.   Centurion mustssign each facility a Health Services Administrator ("HSA") who is supposed to "develop site-specific procedures" for the assigned facility and "carry out DDOC policies."

35.   These site-specific policies must describe in detail how a policy is to be implemented and followed at each site.  These site-specific policies are then reviewed and approved by DDOC.  All such policies are supposed to be reviewed annually.

36.   CRX is responsible for convening and facilitating the Pharmacy and Therapeutics Committee meetings on a quarterly basis with the goal of ensuring constitutionally adequate medication administration to patients.

37.   Centurion also must participate in the Pharmacy and Therapeutics Committee decision making process and work with CRX on medication decisions.

38.   BHSAMH and DDOC also must participate in the Pharmacy and Therapeutics Committee decision making process and work with the CRX on medication decisions.

39.   BHSAMH is supposed to convene and facilitate the state level Continuous Quality

Improvement meetings with all relevant health care vendors to ensure constitutionally adequate delivery of healthcare.

40.    On the facility level, Continuous Quality Improvement meetings are held and led by the HAS and include members of the facility medical and support staff.  The CQI conduct studies to identify healthcare system concerns, including discontinuation of medications and impact on patient health and wellness.

41. All three entities, DDOC, Centurian, and CRX, are jointly tasked with developing, reviewing, editing and finalizing new versions of policies and procedures relative to patient health and healthcare, including verifying that all site-specific procedures comply with all current NCCHC and ACA standards as well as federal law.

42.    All three entities also participate in a "Joint Vendor Meeting," at least quarterly to "ensure collaboration exists among the various services that are delivered statewide."

**The Role of Providers**

43.    Providers are directly responsible for the healthcare of patients, including but not limited to conducting examinations of patients during sick call and scheduled examinations. Along with nurses, providers respond to the medical complaints of individual patients regarding chronic pain, neurological and health issues.

44.    Providers are directly responsible for sending patients for specialist diagnostic testing including MRIs, X-Rays, and electromyograph ("EMG") testing which assesses the health of orthopedic issues, muscles, motor neurons and neurological deficits.

45.    Providers are responsible for designating a patient as in need of chronic disease monitoring in a Chronic Care Clinic, including but not limited to: diabetes, sickle cell anemia, multiple sclerosis, seizure disorders, cancer, and chronic pain.

46.      Providers are directly responsible for prescribing medications available in the DDOC's "Formulary Book" when a plaintiff class member requires prescriptive care.

**The Role of CRX and the Formulary**

47.      The DDOC's "Formulary" is the Preferred Drug List and Stock Medication List maintained by CRX.

48.      The DDOC's "Formulary" lists all the medications available for providers to prescribe without approval.

49.      For prisons, formularies are also established to ensure that the drugs prescribed are convenient to administer in a correctional environment and have a low potential for abuse.

50.      Providers cannot prescribe medications that are "Non-Formulary" without the approval of a CRX pharmacist.

51.      Historically, Non-Formulary medications include narcotics, medications "Scheduled" in accordance with the Controlled Substances Act, and medications not generally carried in the DDOC's pharmacies.

52.      DDOC Policy No. A-03 warns, "When a treatment or medication cannot be available at a Level 4 or Level 5 facility because of security concerns an Alternative Treatment Plan shall be developed by the institution Medical Director or designee."

**The Role of Consultants and Specialty Medical Providers**

53.      Providers are directly responsible for issuing referrals for patients to outside consultants and specialists when Providers are not skilled or experienced enough to diagnose or treat specific conditions.

54.      Providers personally review the reports and recommendations of specialists who treat the plaintiff class members.

55.     Despite the money spent by the State to facilitate these specialty visits, DDOC policy allows providers to ignore specialist recommendations and orders.  Policy D-02 states, "Medication/treatment prescribed as a result of an outside consultation or hospitalization shall be considered a recommendation (not an order) and must be reviewed by a DDOC credentialed provider.  The provider reviewing the recommendation may approve the recommendation as is, modify or reject the medication/treatment and choose a different medication/treatment and choose a different medication/treatment as clinically indicated and in the best interests of the patient.  Any changes must be documented in the EHR."

56.     DDOC policy essentially allows a nurse practitioner or other provider with no specialized training to ignore the recommendations of the very specialty practitioners the State has paid to consult.

57.     Treating specialists have no ability to directly ensure prescriptions or treatment to DDOC's patients.

**The Role of Connections Community Support Programs, Inc ("Connections")**

58.     Connections provided health care services for DDOC from 2014 to April 1, 2020.

59.     In early 2019, after whistleblower reports emerged of Connections forcing employees to falsify records to defraud taxpayers, the Delaware Department of Justice opened an investigation against Connection's practices in Delaware prisons.

60.     In the summer of 2019, DDOC Commissioner Claire DeMattesis ordered an independent review of the healthcare afforded to prisoners in Delaware.  ChristianaCare undertook the review.

61.     In November of 2019, ChristianaCare issued a report that found that healthcare in DDOC was extremely siloed, lacked quality improvement measures, and required substantial

resources – including money and staff – to ensure improvement.

62.    The Department of Justice also proceeded to file suit against Connections for fraud and other derelictions of duty.

63.    Around the time the ChristianCare report was issued, in late 2019, Connections, CRX and the Bureau implemented a policy and practice to curtail and discontinue effective pain medication of inmates suffering from chronic pain and neuropathic conditions.  The policy and practice was identified as the "Pain Management Initiative" ("the Policy").

64.    As a result of this policy and practice, providers in DDOC facilities began discontinuing medications from patients despite individual needs and/or documented effectiveness.

65.    The discontinuation of effective pain medication was not done with the consultation of pain management specialists.

66.    Patients who had been successfully treatment with medications that lessened suffering and improved function – the hallmarks of successful chronic pain management – summarily lost their effective treatment due to the Policy.

67.    Some, but not all, of the effective pain medication that had been effectively treating DDOC inmate patients that were on the Pain Management Initiative "Hit List" were: Neurontin/Gabapentin,[1] Lyrica/Pregabalin[2], Ultram/Tramadol[3], opioids, and muscle relaxants. All of these medications can be effective treatment of chronic pain conditions, spasms, and neuropathic pain.  More importantly, many of the medications targeted were excellent substitutes

---

[1] For ease, all references to Neurontin or Gabapentin have been changed to Gabapentin, the generic name for the medication.

[2] For ease, all reference to Lyrica or Pregabalin have been changed to Lyrica, the brand name for the medication.

[3] For ease, all references to Tramadol or Ultram have been changed to Tramadol, the generic name for the medication.

for opioids to treat chronic pain.

68.     Some of the patient victims of the Policy had been effectively treated for years. Without medical justification nor acknowledgement of the effectiveness of the medication, providers discontinued effective treatment.

69.     In many cases, the provider encounter notes included the very same cut and pasted statement about the Pain Management Initiative: "Inmate educated on the Pain Management Initiative - Must determine the root of the cause of the pain, act appropriately and treat/manage as medically indicated. GABAPENTIN (NEURONTIN) not recommended for chronic pain described. Will taper and discontinue. Alternative options provided."

70.     In most, if not all cases, the root cause of the patient's pain had been determined repeatedly.  Diagnosis was not in question.

71.     In most, if not all, cases, no effective alterative options were provided other than over-the-counter medications like Tylenol, Ibuprofen or Aleve or recommendations that the patient try "yoga" or "breathing techniques."

72.     Prior to the discontinuation of pain medication, no individual assessments of the patients were performed or required to be performed.  The discontinuation was done solely in light of the new Pain Management Initiative, not because the medical needs or conditions of the patient had changed.

**Centurian Adopted and Continued to Implement the Unconstitutional Policy**

73.     When Centurian took over from Connections on April 1, 2020 most of the providers were retained in their positions – the employer simply changed from Connections to Centurian.

74.     Centurian did not reassess the Pain Management Initiative nor abate the

unconstitutional discontinuation of effective medical treatment despite being aware of the impact on patients.

75.    In the wake of the policy, patients filed many grievances regarding loss of effective treatment.  Patients repeatedly asked that their effective medications be reinstated.

76.    The abrupt discontinuation of effective medications without medical justification or individualized assessments was a deviation from the standard of care and even deviated from standards adopted in other correctional health care systems.

**Standard of Care in the Correctional Environment**

77.    Elimination of certain medications to treat chronic conditions does not comport with the standards adopted by other prison systems or the standard of medical care in the community.  This is especially true for the management of chronic pain where individualized assessments are essential given that different medications and/or treatment modalities work differently on the symptoms of different patients.

78.    There are two major accrediting organizations in the United States for prison health care services: National Commission on Correctional HealthCare ("NCCHC") and American Correctional Association ("ACA").

79.    Centurian's contract with DDOC states that it will "provide all services in compliance with NCCHC and ACA national standards," among others.

80.    In 2018, the NCCHC published a position statement on "Management of Noncancer Chronic Pain."

81.    The position states, "Because complaints of chronic pain are common in corrections, corrections clinicians must address the challenges presented. The use of adjunctive medications such as opiates or GABA analogues [these include Gabapentin and Lyrica] is

particularly troublesome in the correctional environment because of very high percentage of inmates have a history of substance abuse, chemical dependency, and misuse of prescription medications . . . On the other hand, the confinement environment provides opportunities to obtain information (e.g., a patient's physical activities in the housing unit, at recreation, and at work) that can be important when assessing function and when reviewing the efficacy of treatment . . . Therefore, when patient function remains poor and pain is not well controlled, and other options have been exhausted, a therapeutic trial of medication, including opioids, should be considered . . . Clinicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain). Rather clinicians should consider all aspects of the problem and all available proven modalities. [4]In its further statement, NCCHC recommended: "Chronic pain should be addressed like other chronic medical conditions, in a systematic, objective, structured manner beginning with diagnosis and treatment planning and proceeding with structured and regular monitoring of progress. Clinicians should establish measurable treatment goals for chronic pain and measure progress against them. . . They must be functional in nature, measured against the patient's established baseline . . . Most chronic pain can be managed through primary care clinicians. However, an interdisciplinary team approach is often beneficial, and specialty care, including pain management, should be available for patients whose function and chronic pain are not improved with treatment… Policies banning opioids should be eschewed. Opiates should be considered with caution after weighing other treatment options."

    82.    In June of 2018 the Federal Bureau of Prisons ("BOP") published its "Pain Management of Inmates," Clinical Guideline.[5]  Even the BOP clinical guideline does not

---

[4] https://www.ncchc.org/position-statements (last visited July 12, 2022.)
[5] https://www.bop.gov/resources/pdfs/pain_mgmt_inmates_cpg.pdf (last visited July 12,

prohibit the use of opioids or neuromodulating medications like Lyrica and Gabapentin.

83.    The ACA website lists the BOP's Clinical Guideline, "Pain Management of Inmates," as its clinical guideline standard.[6]

84.    The American Medical Association ("AMA") also does not restrict the prescription of certain medications.

85.    In fact, the AMA House of Delegates is focused on removing barriers to treatment and appropriate analgesic prescribing for pain management.  The AMA House of Delegates has directed the AMA to actively lobby to have Medicare and Medicaid Services allow for reimbursement of off-label prescription of medications, including Gabapentin, "at the lowest co-payment tier for the indication of pain so that patients can be effectively treated for pain and decrease the number of opioid prescriptions written."

86.    The standard in the medical community is to use medications like Gabapentin, Lyrica and other non-opioid alternatives to treat chronic conditions to reduce the number of opioid prescriptions.  The standard in the medical community is not to restrict all effective treatment.

87.    The reality is that incarcerated patients have a higher-than-average prevalence of disease, as well as substance use disorders and psychiatric illness, often in combination.[7]

88.    Prison populations also have a higher-than-normal incidence of patients with

---

2022.)

[6]https://www.aca.org/ACA_Member/Healthcare/Resource_Center/Clinical_Guidelines/ACA/ACA_Member/Healthcare_Professional_Interest_Section/HC_ClinicalGuidelines.aspx?hkey=b6875237-8d5a-4c24-bca9-e41ee36d3507 (last visited July 11, 2022).

[7] See The Pew Charitable Trusts, *Pharmaceuticals in State Prisons: How departments of corrections purchase, use and monitor prescription drugs* (Dec. 2017) at https://www.pewtrusts.org/en/research-and-analysis/reports/2017/12/pharmaceuticals-in-state-prisons (last visited July 11, 2022).

major spinal cord injuries, due to traumatic events and gun violence.

89.    Treatment protocols are also necessarily different in prisons. Diet modification, exercise and non-medicinal treatments are not as available. DDOC prisoners often wait months to see specialists, receive diagnostic testing, surgeries and follow-up care.

90.    Therefore, pharmaceuticals, which already play an important role in the U.S. health care system, take on an even greater therapeutic importance in prisons.

91.    A December 2017 Pew Charitable Trust study found that use of prescription drugs in the prison population may decrease total medical costs because appropriate use of prescription drugs can avert even more expensive unplanned hospital admissions.[8]

92.    Many psychiatric drugs are 'low cost' due to their availability of reasonable lower-costs psychotropic alternatives and the drop in the high price of some older ones due to these drugs coming off patent during the last several years.[9]

93.    In fact, to adapt to the risks of diversion and abuse, DDOC developed a number of policies over the last twenty years including 1) the administration of the medications one-on-one, meaning a nurse watches as the medication is taken by a patient; and 2) the crushing and dilution in water so a patient must drink the medication to guard against diversion or abuse.

94.    DDOC can also administer a simple blood test that measures the amount of certain medications in a patient's blood stream, as well as the presence of any other illicit medications or drugs. This allows providers to tell whether a patient is diverting medication or is at risk of negative interactions with other medications or drugs.

95.    Available records show that providers repeatedly and systematically refused the

---

[8] See The Pew Charitable Trusts, *Pharmaceuticals in State Prisons: How departments of corrections purchase, use and monitor prescription drugs* (Dec. 2017) at 5.
[9] *Id*. at 17.

prescription or re-prescription of certain medications to patients to effectively treat chronic pain, nerve and other health issues, no matter the patient's individualized medical needs or proven efficacy due to the Policy.

**PLAINTIFFS AND PROPOSED CLASS REPRESENTATIVES[10]**

96.    **JENAIL BROWN** ("Mr. Brown") is a 42-year-old inmate currently housed at JTVCC.

97.    In 1996, Mr. Brown suffered a gunshot wound to his right foot which required multiple surgical repairs, including muscle and skin grafts. Mr. Brown's injury resulted in a significant deformity to his right foot causing constant pain. Mr. Brown further suffers from neuropathy due to the gunshot wound. Additionally, Mr. Brown suffers substantial pain in his knees due to osteoarthritis and degenerative joint disease.

98.    While at JTVCC, until approximately 2016, Mr. Brown received over the counter ("OTC") pain medications such as Tylenol and Ibuprofen, but this regimen repeatedly failed and Mr. Brown continuously voiced complaints of pain and mobility issues due to his foot and knee issues.

99.    On August 16, 2016, Mr. Brown was seen by Defendant Carla Miller. Mr. Brown rated his pain as a constant 7-8 out of 10, with 10 being the highest. At that time, Miller issued an order for 50mg of Tramadol twice daily along with 600mg of Ibuprofen twice daily.

100.    Mr. Brown's Tramadol prescription was repeatedly increased and by September 14, 2017, Mr. Brown was receiving 100mg of Tramadol ER twice daily. At this dosage and

---

[10] The representative patients' medical histories and history of treatment have been greatly reduced for brevity and to omit references to ailments and conditions not germane to this litigation.

frequency, Mr. Brown reported that his pain level was down from the usual 7-8 to just 3 out of 10.

101.    On September 22, 2017, however, Mr. Brown again reported his pain level at 8 out of 10, with "burning pain in his feet and toes." To address his neuropathic pain, Dr. Adrian Harewood started Mr. Brown on Lyrica. Throughout 2018 and much of 2019, Mr. Brown received varying doses of Tramadol and Lyrica, as well as custom-fitted shoes, knee braces, and lidocaine patches, all of which contributed to generally relieving his pain.

102.    On October 19, 2019, Mr. Brown had a provider visit with Defendant McAfee-Garner.  At that time, Defendant McAfee-Garner discussed the "Pain Management Initiative" and noted that Tramadol "may be habit-forming" and is "[n]ot recommended for long term use in DDOC." She noted no concerns that Mr. Brown was abusing or diverting his medications. Defendant McAfee-Garner told Mr. Brown that the "whole state" was being taken off Tramadol.

103.    Despite Mr. Brown's warning that a change would make his condition worse and would exacerbate his pain, Defendant McAfee-Garner issued an order to taper and discontinue Mr. Brown's Tramadol.

104.    In the months that followed, Mr. Brown repeatedly reported that his medication regimen was no longer effective in relieving his pain and requested to be placed back on Tramadol. He also reiterated many times that it had taken years to find a pharmaceutical regime that improved his function and diminished his unrelenting pain.

105.    Despite requests and constant sick call visits for the pain, Mr. Brown was not placed back on his effective treatment regimen, nor did providers find an effective alternative treatment.

106.   **JEREMY CARTWRIGHT** ("Mr. Cartwright") is a 49-year-old inmate currently housed at JTVCC.

107.   Mr. Cartwright suffers from several medical and mental health issues. Mr. Cartwright has diabetes and, as a result, suffers from diabetic neuropathy. He further suffers from multilevel degenerative disc disease, which causes severe back pain.

108.   Between 2015 and 2017, Mr. Cartwright received various combinations and dosages of pain and mental health medications, including Gabapentin, Lyrica, Elavil, and Cymbalta.

109.   Between 2017 and 2019, Mr. Cartwright's neuropathic pain was controlled by varying dosages of Gabapentin. Around August 2019, after years of sufficient pain relief, the Gabapentin began to have diminished effects for Mr. Cartwright.

110.   In September 2019, Mr. Cartwright requested a trial of Lyrica for his neuropathic pain, and on October 9, 2019, Defendant William F. Ngwa changed Mr. Cartwright's prescription from Gabapentin to 100mg of Lyrica twice daily. The Lyrica improved both his chronic pain symptoms and function.

111.   On November 9, 2019, Mr. Cartwright was seen by Defendant McAfee-Garner, at which time they discussed the "Pain Management Initiative." Defendant McAfee-Garner discontinued Mr. Cartwright's 100mg of Lyrica, and offered him a steroid for ten days.

112.   After his Lyrica was discontinued, and through at least September 21, 2020, Mr. Cartwright's neuropathic and back pain was inadequately treated with common OTC medications, such as Naproxen and Tylenol.

113.   Throughout 2020, Mr. Cartwright repeatedly requested to be placed back on Lyrica but was unsuccessful. Providers did not attempt to identify an effective alternative treatment.

114.   **JEFFREY CLAYTON** ("Mr. Clayton") is a 41-year-old inmate currently housed at JTVCC.

115.   Mr. Clayton has multiple shoulder and spine issues that cause severe, and at times debilitating, pain.

116.   Mr. Clayton suffers osteoarthritis in his right shoulder and AC joint, with pain, numbness, and tingling radiating from his neck down to his fingers. Mr. Clayton furthers suffers from spondylitic changes to his cervical spine, which include multilevel endplate changes, osteophytosis and facet degenerative changes throughout.

117.   On August 8, 2018, Mr. Clayton reported to Defendant Atangcho he had an increased level of constant pain and that the tingling and numbness radiating down his arm was worsening.  Defendant Atangcho started Mr. Clayton on 300mg of Gabapentin twice daily.

118.   Throughout the following months, JTVCC medical staff increased Mr. Clayton's Gabapentin dosage several times. By March 2019, Mr. Clayton was receiving 800mg of Gabapentin twice daily, which generally helped his shoulder pain and significantly improved the numbness and tingling that was radiating down his arm.

119.   On November 11, 2019, Mr. Clayton was seen in the chronic care clinic by Defendant William Ngwa. Mr. Clayton reported that the Gabapentin "help[ed] relieve the numbness that radiates" to his hand, but that it did not relieve his back pain, which at times was debilitating. In response, Defendant Ngwa began decreasing Mr. Clayton's Gabapentin —a taper order—and prescribed him 5mg of Flexeril twice daily "for muscle pain."

120.   Defendant Victor Heresniak continued to wean Mr. Clayton's Gabapentin to only 300mg twice daily through a "chart review" – meaning, he did not see nor examine Mr. Clayton.

On January 3, 2020, Mr. Clayton again began experiencing increased shoulder pain and reported that the numbness and tingling in his arm had returned.

121.    By February 3, 2020, Mr. Clayton's Flexeril prescription was discontinued.

122.    On March 17, 2020, Mr. Clayton's Gabapentin prescription was discontinued entirely by Defendant Heresniak. Thereafter, Mr. Clayton continued to report numbness and tingling down his arm as well as both shoulder and back pain.

123.    In the following months, Mr. Clayton was not prescribed an effective alternative medication. Despite his repeated complaints of pain, numbness, and tingling, Mr. Clayton instead received only ineffective OTC pain medications such as Naproxen and Ibuprofen.

124.    **WILLIAM CORDELL** ("Mr. Cordell") is a 62-year-old inmate currently housed at JTVCC.

125.    Mr. Cordell is a diabetic and has suffered chronic hip and back pain after a serious car accident in 1976. In 2013, Mr. Cordell's pain became far more problematic as he began experiencing impaired mobility and nerve-related issues such as tingling down his legs.

126.    Mr. Cordell suffers from many spinal issues including facet joint hypertrophy, retrolisthesis with disc protrusions, spinal stenosis with radiculopathy, multilevel disc disease, and osteoarthritis. He also struggles with diabetic neuropathy as well as osteoarthritis and tendinosis of the right hip. Mr. Cordell frequently complains of severe back and hip pain along with stinging and tingling sensations and swelling down his leg.

127.    On October 21, 2016, Mr. Cordell was assessed by provider Kathleen M. Gustafson and reported that his "back is not better and [his] right hip is really bad." He also voiced concerns that "I can be walking and al [sic] of a sudden I am dragging my right leg and don't [know] if it

is from my back or my hip. My pain is 7-8/10 and can just be ungodly aching." Gustafson instructed him to continue taking Ibuprofen 600mg as needed for pain.

128.   On November 17, 2016, Mr. Cordell was again seen for reports of pain and tingling. At that time, Dr. Herman Ellis ordered Tramadol 50mg three times daily for one week and also started Mr. Cordell on 600mg of Gabapentin three times daily. Mr. Cordell continued with various dosages of Tramadol and Gabapentin with good effect on his chronic pain and function.

129.   Nearly three years later, on October 15, 2019, Mr. Cordell was seen by Defendant Atangcho. At that time, Defendant Atangcho noted Mr. Cordell had "bothersome" chronic pain and that "[Gabapentin] is not indicated for the kind of pain which he is being treated for," despite hundreds of studies indicating Gabapentin's successful use by patients for chronic pain complaints.   Defendant Atangcho issued a taper order to begin weaning Mr. Cordell off Gabapentin, and also explained that "per pharmacy recommendations," Mr. Cordell would no longer receive the extended-release Tramadol and instead needed to use instant-release Tramadol. Nothing about Mr. Cordell's physical state changed to mandate a change in his treatment regimen.

130.   On October 26, 2019, Mr. Cordell was seen by Defendant McAfee-Garner to receive an epidural steroid injection for his back pain. At that time, Mr. Cordell noted that the injections were not effective for his pain, and that he "still get[s] the shooting pains down [his] leg." He described a "sting[ing]" pain that is "sharp achy and shoots down [his] leg."

131.   At that time, Defendant McAfee-Garner discussed the Pain Management Initiative with Mr. Cordell and explained that "[Tramadol] may be habit-forming, even at regular doses. Not recommended for long term use in DDOC. Will taper and discontinue."   There is no indication in the records that Mr. Cordell was diverting or abusing his medications.

132.    On March 7, 2020, Mr. Cordell again saw Defendant McAfee-Garner. Mr. Cordell reported: "I am in extreme pain[] and all my pain meds are gone. I do not understand it. I have documented issues. I am diabetic and they stopped the [Gabapentin]. I do not understand."

133.    Five months after the medication was stopped without medical justification, Defendant McAfee-Garner restarted Mr. Cordell's Gabapentin "due to the diagnosis of DM with nerve pains" at a very low dose.

134.    Approximately three months later, on June 4, 2020, Defendant Denkins referred Mr. Cordell for an off-site follow up consultation for his back problems. The consultation report noted Mr. Cordell's complaints of severe pain causing cramps and leg spasms and that he was unable to tolerate the pain especially after all his medications were discontinued.

135.    At that time, the outside provider added an order for 20mg of Baclofen twice daily while also reiterating that "[Gabapentin] was reduced due to facility guidelines" and that the reduced dose does not help Mr. Cordell's pain.

136.    On August 6, 2020, Mr. Cordell was seen by Defendant Feeah M. Stewart.  Mr. Cordell complained of chronic back pain and intermittent leg pain and swelling. He also requested to receive his Gabapentin again and if not, to at least increase his Lyrica dosage.

137.    Despite his request, Defendant Stewart informed him that "we will not increase Lyrica or add Gabapentin back to his medication regimen at this time."  Instead, Defendant Stewart ordered 800mg of Motrin twice daily "for symptom management."

138.    It was only in late November of 2020 that Mr. Cordell's effective pain management regime was reinstated through the intervention of Dr. Adrian Harewood, an outside specialist who recommended "continue [Gabapentin] 600mg TID and Tramadol 100am and 200mg pm as previously ordered."

139.   Mr. Cordell suffered needlessly for months under the Policy.

140.   **BRYAN CORDREY** ("Mr. Cordrey") is a 33-year-old inmate currently housed at JTVCC.

141.   Mr. Cordrey suffers from various medical and mental health issues. His medical issues involve several degenerative spine problems, including lumbar radiculopathy, disc space desiccation, facet joint arthrosis, and foraminal stenosis. As a result, Mr. Cordrey suffers from chronic back pain along with pain, numbness, and tingling in his upper extremities. In May 2017, Mr. Cordrey's back pain began radiating down his right leg and he started to experience muscle spasms in his lower back as well as restless leg syndrome.

142.   Up until July 2017, Mr. Cordrey received various OTC pain medications such as Motrin, Tylenol, and Ibuprofen, and he also attended physical therapy. This treatment regimen, however, was unsuccessful and Mr. Cordrey remained in tremendous pain.

143.    On July 6, 2017, provider Mills wrote an order to begin Mr. Cordrey on 5mg of Flexeril in addition to his physical therapy treatment.

144.   On July 31, 2017, Mr. Cordrey continued to report back pain despite the Flexeril and physical therapy treatments. At that time, Mills added an order to start Gabapentin.

145.   By September 2017, Mr. Cordrey was receiving 600mg of Gabapentin twice daily and 10mg of Flexeril.

146.   In April 2018, Mr. Cordrey's Flexeril was discontinued as he reported that he believed it was worsening his restless leg syndrome. On April 29, 2018, Mills started Mr. Cordrey on Robaxin to replace the Flexeril, but his pain persisted.

147.   On July 9, 2018, per Mr. Cordrey's request, Mills changed Mr. Cordrey's Robaxin order to Baclofen.

148.    On January 30, 2019, Mr. Cordrey was seen by Defendant Charles Reinette. Mr. Cordrey reported poor pain control and requested Tramadol because Gabapentin was helping only with his nerve pain. Defendant Reinette rejected the request, noting that there was "no indication for [Tramadol] at this point." Defendant Reinette did not order any diagnostics that might reassess and evaluate Mr. Cordrey's condition.

149.    On June 4, 2019, Mr. Cordrey was seen by Defendant Ngwa and reiterated his need for a better pain management strategy for his back pain. Accordingly, Defendant Ngwa added an order for 50mg of Tramadol twice daily.

150.    In addition to the Tramadol, Mr. Cordrey's pain medication regimen then consisted of Baclofen 20mg twice daily, Motrin 600mg twice daily, and Gabapentin 800mg twice daily. The combination finally managed to alleviate his pain symptoms and improve his function.

151.    Just four months later, on October 15, 2019, Mr. Cordrey saw Defendant Atangcho. Defendant Atangcho explained to Mr. Cordrey that "[Gabapentin] is not indicated for the kind of pain which he is being treated for" and she tapered his Gabapentin. Again, this was not true.

152.    Mr. Cordrey asked Defendant Atangcho to increase his Tramadol dosage if he was being taken off Gabapentin, but Defendant Atangcho told him that Tramadol "is not used for chronic pain." As such, Defendant Atangcho noted that she would "let [the] current order run out." In notes, Defendant Atangcho noted "Pain Management Initiative" including the oft-repeated refrain: "must determine the root cause of the pain, act appropriately and treat manage as medically indicated." Of course, the root cause of Mr. Cordrey's pain was known and the effective combination of pharmaceuticals to manage it had taken a very long time to discover.

153.    On October 16, 2019, Defendant McAfee-Garner discussed the Pain Management Initiative with Mr. Cordrey and explained that Tramadol "may be habit-forming, even at regular

doses" and is "[n]ot recommended for long term use in DDOC." At that time, Defendant McAfee-Garner issued an order to taper and then discontinued Mr. Cordrey's Tramadol. The records make no suggestion that Mr. Cordrey was abusing or diverting his medications.

154.   After his Gabapentin and Tramadol were discontinued, Mr. Cordrey's pain quickly worsened. By December 31, 2019, Mr. Cordrey reported aching pains with "shooting burning pain to [his] extremities." He further noted that the pain is sometimes so severe that he is unable to get out of bed and often cannot put on his own clothes without someone assisting him.

155.   Throughout 2020, Mr. Cordrey continued to suffer in pain and his treatment regimen was limited to medications such as Ibuprofen and occasional Lidoderm patches, which repeatedly proved ineffective.

156.   **PHILIP DAVIS** ("Mr. Davis") is a 46-year-old inmate currently housed at JTVCC.

157.   Mr. Davis suffers tremendous neck, back and knee pain after falling thirty feet from a ladder in 2006. His neck and back issues include degenerative disc disease of the cervical spine, disc desiccations in the lumbar spine, lateral recess stenosis, and cervical radiculopathy. In addition, Mr. Davis has arthritis of the knees which causes substantial pain and limits his mobility.

158.   Mr. Davis frequently experiences numbness and tingling in his arms and a burning sensation in his neck that radiates to the arms.

159.   In 2007, Mr. Davis received multiple nerve block injections in his cervical spine but his pain persisted and he later underwent a cervical laminectomy of the C5 to C7 vertebrae.

160.   Throughout the years, Mr. Davis and his medical providers have attempted many different medication regimens to manage his pain.

161.    By January 2015, Mr. Davis was receiving 900mg of Gabapentin twice daily and 75mg of Elavil at bedtime to manage his pain. Although the Elavil was prescribed to Mr. Davis primarily for mental health purposes, it also provided additional nerve pain relief.

162.    On April 7, 2017, his repeated reports of severe radiating pain, numbness, and tingling, Defendant Miller added 10mg of Flexeril twice daily to Mr. Davis' medication regimen.

163.    In August 2017, Mr. Davis reported better pain relief with Baclofen than with Flexeril, and DDOC medical staff provided him with Baclofen as requested.

164.    By October 2018, Mr. Davis' pain management regimen consisted of 900mg of Gabapentin twice daily, 20mg of Baclofen twice daily, physical therapy, OTC medications such as Tylenol and Ibuprofen as needed, and occasional short-term orders for Tramadol.

165.    On November 9, 2019, Defendant McAfee-Garner discussed the Pain Management Initiative with Mr. Davis and suggested that Gabapentin was not recommended for chronic pain. Defendant McAfee-Garner issued an order to taper and discontinue both Gabapentin and Baclofen.

166.    On November 19, 2019, Mr. Davis was seen by Defendant Emelia Adah for a pain management visit. Defendant Adah "discussed the facility wide, and state-wide plan to continue the lowering of excessive use of [Gabapentin], [Tramadol], [B]aclofen and other medications that have been used fro [sic] years to treat chronic pain." Defendant Adah discontinued Mr. Davis' effective treatment despite its proven positive effect on his function and chronic pain.  There is no indication that Mr. Davis was diverting or abusing medication.

167.    Less than a month later, on December 6, 2019, provider Lavern Straker-Brown added a "low dose [F]lexeril for complaints of muscle spasms."

168.    After Mr. Davis' Gabapentin and Baclofen were discontinued, Mr. Davis consistently reported worsening pain and impairments to his daily life, but in response he was only given options such as Motrin or Tylenol, which repeatedly proved ineffective.

169.    **SEAN DUPREE** ("Mr. Dupree") is a 52-year-old inmate currently housed at JTVCC.

170.    Mr. Dupree is anemic and has a history of Reflex Sympathetic Dystrophy ("RSD"), which is a form of Complex Regional Pain Syndrome. RSD is a chronic condition involving severe burning pain usually in the extremities.

171.    Mr. Dupree suffers chronic, radiating pain stemming from his knees, neck, back and left arm. His pain has been ongoing since approximately 2001.

172.    Mr. Dupree has undergone multiple arthroscopic knee surgeries, including a failed surgery that led to destabilization of his knee, and is still in need of knee replacement surgery. His knee issues include osteoarthritis, joint effusion, patellar tendinosis, and cartilage damage, among others. Mr. Dupree also suffers from restless leg syndrome.

173.    In 2001, Mr. Dupree underwent surgical repairs on his left wrist, including a wrist fusion. As a result, Mr. Dupree has constant numbness and tingling in his left wrist and arm.

174.    In or around late 2001 and early 2002, Mr. Dupree injured his neck and required surgical intervention.

175.    Even after a spinal cord stimulation procedure, his neck and upper back pain persisted. Mr. Dupree also suffers tremendous lower back pain due to sciatica.

176.    Since at least 2015, Mr. Dupree's pain has been managed by various dosages of Tramadol and Gabapentin along with occasional steroid injections.

177.   By November 2016, Mr. Dupree was receiving 100mg of Tramadol ER twice daily, 600mg of Gabapentin twice daily, and 75mg of Elavil every morning.

178.   Although Mr. Dupree was not without *any* pain, this medication regimen proved generally effective and allowed him to engage in activities of daily life.

179.   Between November 2016 and October 2019, Mr. Dupree's medication regimen remained fairly stable and included varying dosages of Tramadol ER, Gabapentin, and Elavil.

180.   On October 19, 2019, Mr. Dupree was seen by Defendant McAfee-Garner.

181.   After explaining the Pain Management Initiative, Defendant McAfee-Garner noted that Tramadol "may be habit-forming" and is "[n]ot recommended for long term use in DDOC." At that time, Defendant McAfee-Garner initiated an order to taper and discontinue Mr. Dupree's Tramadol.

182.   By November 10, 2019, Mr. Dupree was no longer receiving Tramadol for pain.

183.   On January 13, 2020, Mr. Dupree asked Defendant Adah about his Gabapentin and was informed that Gabapentin "was not indicated in the management of his chronic pain." Defendant Adah ordered the continued taper of Mr. Dupree's Gabapentin and provided an order for Tylenol as needed for pain.

184.   Mr. Dupree's Gabapentin was discontinued on January 27, 2020.

185.   Thereafter, Mr. Dupree continued to report severe pain and burning sensations, particularly in his left arm down to his hand.

186.   On March 16, 2020, Mr. Dupree was seen by Defendant Stewart and reported tingling and pain in both of his feet, which he described feeling "like pins and needles." Defendant Stewart did nothing.

187.    On October 11, 2020, Mr. Dupree was seen by Defendant McAfee-Garner to receive a steroid injection. He reported to Defendant McAfee-Garner that his sciatica was causing a continuous, throbbing pain that shoots down his leg. Mr. Dupree stated that it was so severe, "I cannot move. I had to have the guys carry me to the bathroom last night."

188.    Mr. Dupree unnecessarily suffered despite the fact that he had been treated for years with an efficacious pharmaceutical regime that was summarily discontinued due to the Policy and not his individualized medical needs.

189.    **JAMES ELLIOTTE** ("Mr. Elliotte") is a 63-year-old inmate currently housed at JTVCC.

190.    For years, Mr. Elliotte has struggled with severe back, hip, abdominal and testicular pain. Mr. Elliotte's back and hip issues have led to years of chronic pain.  Mr. Elliotte has various back and spine problems including sciatica, lumbar degenerative joint disease, thoracic spine spondylosis, narrowing disc spaces in the L-spine and facet joint arthritis, among others.  He often reports pain shooting down his leg and frequently experiences numbness in his hip.

191.    On January 20, 2017, Mr. Elliotte reported minimal pain relief with NSAIDs and began receiving 300mg of Gabapentin at night. In April 2016, Defendant Miller added 100mg of Celebrex twice daily to help alleviate Mr. Elliotte's pain.

192.    Over the next few months, Mr. Elliotte continued to complain of back pain and his testicular problems worsened, causing him even more pain.

193.    In July 2017, Mr. Elliotte's Gabapentin was increased from once at night to twice daily.

194.    Still, between July 2017 and early 2019, Mr. Elliotte reported frequent pain in his back, testicles, and abdomen. His abdominal pain radiated into his hips and Mr. Elliotte also began experiencing muscle spasms.

195.    On June 12, 2019, Defendant Ngwa examined Mr. Elliotte and began an order for Baclofen to help with his spasms. By August 2019, Mr. Elliotte's Gabapentin dose was also increased to 600mg three times daily.

196.    On October 22, 2019, Mr. Elliotte was seen by Defendant Heresniak, who noted Mr. Elliotte's abdominal pain was ongoing for over a year with no cause found. Accordingly, Dr. Heresniak determined there was "[n]o indication for further diagnostic evaluation at this time, will wean medications."  Defendant Heresniak did not order diagnostics nor note that the current medication regime helped with Mr. Elliotte's chronic pain issues.

197.    On November 17, 2019, Defendant McAfee-Garner discussed the Pain Management Initiative with Mr. Elliotte. Defendant McAfee-Garner reiterated Dr. Heresniak's earlier orders to taper and then discontinue both the Gabapentin and Baclofen. Instead, Mr. Elliotte was to continue OTC remedies.

198.    After his Gabapentin and Baclofen were discontinued, Mr. Elliotte's pain worsened and he constantly reported his symptoms and worsening function.  Defendants did nothing to find an effective alternative.

199.    **FRANKIE GALINDEZ** ("Mr. Galindez") is a 46-year-old inmate who was housed at James T. Vaughn Correctional Center ("JTVCC") but has been released.

200.    While incarcerated in April 2016, Mr. Galindez reported lower back pain and painful "burning" sensations in both of his legs. He reported a history of lower back pain on his right side, scoliosis, and noted that he underwent spinal surgery in 2004.  Mr. Galindez was on a

muscle relaxer, a pain medication, and Gabapentin at Gander Hill, but these treatments were discontinued when he moved to JTVCC.

201.   At JTVCC, he was given a lumbar spine back brace and the following medication: Elavil 25 mg every evening, Baclofen 20 mg twice daily as needed, and Mobic 7.5 mg daily as needed.

202.   On July 26, 2016, provider Mills increased Mr. Galindez's Baclofen dose to 30 mg twice daily as needed and advised him to keep taking Mobic for pain management.

203.   In March 2017, Mr. Galindez was prescribed 400 mg of Gabapentin twice daily and Mills suggested he attempt to come off Tramadol. In October of the same year, his Gabapentin dosage increased to 800 mg twice daily.

204.   In May 2018, Mills noted that Mr. Galindez had been diagnosed with Lumbar Radiculopathy. Mr. Galindez reported that he was unable to function due to the pain. Mills enrolled him in PT and increased the Gabapentin dosage.

205.   In December 2019, after the Policy went into effect, Mr. Galindez reported he did not want to be weaned off of his medication. Defendant Ngwa nonetheless ordered that Gabapentin be tapered off over a 30-day period due to the policy.

206.   In January 2020, Mr. Galindez requested Gabapentin to manage his nerve and back pain. He refused Elavil, which was prescribed to replace Gabapentin, because he reported it made him extremely sleepy.  Without effective treatment, Mr. Galindez reported increased symptoms, including burning sensation in his legs and increased back spasms.

207.   On April 7, 2020, Jordan Cunningham, PA diagnosed Mr. Galindez with AKI requiring dialysis and rhabdomyolysis.

208.   Mr. Galindez's chronic pain symptoms increased.  In October 2020, he reported to physical therapist Mary Doyle that he was experiencing back spasms where he could not breathe, tingling in his hands and feet, and back pain.

209.   Mr. Galindez was released from DDOC custody on March 23, 2021.  He is currently being treated pursuant to the community standard of care by La Red Health Center with Gabapentin which has significantly diminished his chronic pain and increased his function.

210.   **RONALD GRINE** (Mr. Grine") is a 46-year-old inmate currently housed at JTVCC.

211.   On December 30, 2016, provider Mitchell White prescribed Gabapentin 300 mg twice daily to treat Mr. Grine's chronic pain and discontinued Diclofenac 75 mg. White also noted that he would continue Mr. Grine on a regimen of Mirapex .125 mg to treat restless leg syndrome.

212.   On October 7, 2017, Tamar Jackson, MD, wrote in a progress note that Mr. Grine was examined for chronic back pain. Specifically, he reported that Mr. Grine has a history of MVA with right Tib/Fib fracture requiring traction, hip pain, and right lower back pain with burning shooting pain down his legs. He also reported that Mr. Grine underwent physical therapy for 3 years. Dr. Jackson assessed Mr. Grine and found that he had chronic back pain/lumbar radiculopathy. He noted that Tylenol and Celebrex were not effective in treating Mr. Grine's pain. Dr. Jackson wrote that he would not change Mr. Grine's current Gabapentin prescription because it is effective for radicular symptoms at the current dose. Dr. Jackson noted that x-rays of Mr. Grine's right hip and knee ruled out significant osteoarthritis and that he doubted there would be any benefit from another "NSAID even topical if not effective previously."

213.   On October 11, 2019, Defendant Denkins wrote in a progress note that Mr. Grine was examined because of lower right flank pain, stiffness, sciatica, and right hip pain. She noted

that, according to Mr. Grine, the pain began when he was hit by a car in 1993 and fell off of a roof in 2000. She also noted that she was informed "not to increase pain medications, discontinue long term medications that are used for issues that have been resolved, and not to carry them for months." Her treatment plan for Mr. Grines was to continue Gabapentin 800 mg, Baclofen 20 mg, and Ibuprofen 600 mg and she decreased his Tramadol prescription.

214.    On November 11, 2019, Defendant McAfee-Garner wrote in a progress note that Mr. Grine was educated on the Pain Management Initiative at JTVCC. She noted that the root of his pain must be determined and managed. She noted that she will "taper and discontinue" Mr. Grine's Gabapentin prescription and provide alternative treatment options. Of course, the root cause of Mr. Grine's pain had been "determined" and was "managed" until his effective treatment was discontinued.

215.    Defendant McAfee-Garner suggested OTC Bengay and Motrin which were not effective.

216.    In response, Mr. Grine attended sick call.  He stated, "I don't know what the reason was behind cutting people of their medication, but I am in so much pain.  I have filed grievances about this.  I had multiple fractures and surgeries …you guys just cut everyone off without looking into circumstances."

217.    Defendant Atangcho responded of Tramadol: "we do not use that medication for chronic pain management."  No effective alternatives were prescribed.

218.    On October 2, 2020, Defendant Adah wrote in a progress note that Mr. Grine was seen as a sick call referral for chronic back pain. She wrote that Mr. Grine had been experiencing pain in his back and legs since he was involved in a motor vehicle accident in 1993 and fell off a roof in 2000. She also wrote that Mr. Grine stated that he had been on Tramadol, Baclofen, and

Gabapentin for pain management but that these medications were discontinued. She informed Mr. Grine that Gabapentin, Baclofen and Tramadol were not indicated in the management of chronic pain which was absolutely untrue.

219.    Defendant Adah referred him to physical therapy and continued Ibuprofen 600 mg every 12 hours as needed and added Tylenol ES.

220.    Mr. Grine continued to suffer after his effective treatment was discontinued without medical justification.   There was no indication that Mr. Grine had abused or diverted his medications.

221.    **CHRISTOPHER KING** ("Mr. King") is a 45-year-old inmate currently housed at JTVCC.

222.    Mr. King suffers from chronic back and foot pain. He also suffers from schizophrenia.

223.    On April 25, 2019, Defendant Ngwa wrote in a progress note that Mr. King was seen for sick call. Ngwa noted that Mr. King complained of back and foot pain and stated that he had taken Naproxen and Motrin in the past with no relief. Ngwa prescribed Gabapentin 300 mg twice daily and provided Mr. King with a back brace.

224.    On June 6, 2019, Defendant Reinette renewed Mr. King's Gabapentin 300 mg prescription.

225.    On August 23, 2019, provider Chuks Ihuoma renewed Mr. King's Gabapentin 300 mg prescription.

226.    On September 3, 2019, Defendant Denkins examined Mr. King in the chronic care clinic. She prescribed Mr. King Gabapentin 400 mg.

227.    On September 4, 2019, Defendant Denkins examined Mr. King at a follow up visit at the chronic care clinic. She wrote in a report that Mr. King stated that he was in pain and asked why his pain medication was not being replaced. She wrote that she explained that his Abilify and Celexa prescriptions prevent him from getting any low dose nerve blocker such as Elavil and Pamelor due to the major interactions between the medications. She ordered that he should continue with Gabapentin until it expires and that it should not be renewed.

228.    On November 10, 2019, Defendant McAfee-Garner wrote in a progress note that she assessed Mr. King for chronic pain and that he reported that Gabapentin alleviates his pain. She wrote that, during this assessment, Mr. King was educated on the Pain Management Initiative and that she will taper and discontinue his Gabapentin prescription.

229.    Mr. King has continued in pain since the discontinuation of his effective pain relief. Defendants did not offer him effective alternatives.

230.    **JAPHIS LAMPKINS** ("Mr. Lampkins") is a 68-year-old inmate currently housed at JTVCC.

231.    Mr. Lampkins suffers from diabetic neuropathy. On July 28, 2014, he was receiving Gabapentin 600 mg to treat his neuropathic pain.

232.    On August 13, 2015, Dr. B. Addogah filled out a medical history and physical form for Mr. Lampkins in preparation for cataract surgery. The form noted Mr. Lampkins was taking Baclofen 10 mg and Gabapentin 600 mg.

233.    On July 5, 2016, Defendant Miller wrote that Mr. Lampkins was receiving Baclofen 10 mg twice a day and Gabapentin 600 mg twice a day.

234.    On a Consult Request Form dated December 7, 2016, it was noted that Mr. Lampkins has been diagnosed with diabetes and reported neuropathy.

235.   On February 13, 2017, Mr. Lampkins was discharged from Christiana Care Health Services after receiving a diagnosis of TMJ arthralgia (temporomandibular joint syndrome).

236.   Mr. Lampkins was seen for a follow up consultation on February 27, 2017 by provider Kathleen Gustafson after having TMJ open joint surgery on February 13, 2017. She noted that Mr. Lampkins continued Flexeril at QHS and started Naproxsyn 675 mg twice a day as needed. She noted that, to control his neuropathy, Mr. Lampkins continued taking Gabapentin because it appeared effective in managing his pain.

237.   On May 18, 2020, Defendant Denkins reported that Mr. Lampkins complained of neck and back pain during a chronic care visit, and stated, "this pain is getting worse and it is becoming painful when I swallow."

238.   On May 24, 2020, Mr. Lampkins submitted a request form to see Defendant Denkins and have his medication renewed. He wrote that his medication had been stopped without being examined after he had been taking the medication for many years.

239.   On June 9, 2020, Mr. Lampkins went to sick call and was seen by Defendant Denkins. She explained to him about "the facility wide, state-wide DOC driven regulation to reduce the use of Gabapentin in high dosages to inmates" and that Gabapentin is "allowed for diabetics and is intended to manage diabetic neuropathy in lowest dosage." The progress note also stated that Mr. Lampkins suffered from neuropathy and that his Gabapentin prescription would be reduced.

240.   Mr. Lampkins' effective medication was discontinued without individualized assessment.  Mr. Lampkins' records show no reported incidents of medication abuse or diversion.

241.   **GEORGE LEIFHEIT** ("Mr. Leifheit") is a 50-year-old inmate currently housed at James T. Vaughn Correctional Center ("JTVCC").

242.   On July 17, 2018, Dr. Adrian Harewood examined Mr. Leifheit, who was suffering from chronic neck and back pain and severe pain and tingling in his arms stemming from several forms of spinal canal and foraminal stenoses. Mr. Leifheit also has a history of hypertension and hyperlipidemia. Dr. Harewood prescribed him Gabapentin 400 mg BID.

243.   On July 18, 2019, Mr. Leifheit requested a change in his pain medication. He requested that his Tramadol prescription be changed from 50 mg BID to 50 mg TID, his Gabapentin prescription be changed from 600 mg BID to Gabapentin, or that he receive a prescription of Tramadol ER BID and Lidocaine patch for pain management to treat his cervical stenosis. Defendant Ngwa examined him and wrote in a Progress Note that there was no medical indication to increase Tramadol or Prescribe Tramadol ER.

244.   On October 19, 2019, Defendant McAfee-Garner educated Mr. Leifheit on the Pain Management Initiative. She ordered that his Tramadol be tapered and discontinued because it "may be habit forming even at regular doses." Mr. Leifheit reported to her that he had constant neck and shoulder pain and experienced numbness in the right side of his body.

245.   On November 17, 2019, Defendant McAfee-Garner examined Mr. Leifheit. She ordered his Gabapentin prescription tapered and discontinued as well.  She replaced his effective pain management with ineffective over-the-counter prescriptions.

246.   At some point, a provider prescribed Cymbalta to Mr. Leifheit which caused intolerable side effects including increased blood pressure and difficulty sleeping.

247.   Mr. Leifheit continued to complain of severe neck and back pain and a constant burning feeling in his neck causing numbness and electric shock down his arms.  Defendants did nothing.

248.  **JOHN MAYHEW** ("Mr. Mayhew") is a 54-year-old inmate currently housed at JTVCC.

249.  Mr. Mayhew suffers from lumbar radiculopathy which causes him chronic back pain.

250.  On January 20, 2016, Defendant Miller evaluated Mr. Mayhew. Mr. Mayhew reported that his back pain was constant, whether he was still or moving, and that he experienced numbness in his right lower back. Miller increased his Ibuprofen 600 mg to twice a day, started Gabapentin 300 mg every evening, and requested he receive a back brace.

251.  On February 1, 2016, Defenant Miller wrote in a progress note that she started Mr. Mayhew on Gabapentin 100 mg every morning in addition to his Gabapentin 300 mg every evening.

252.  On March 29, 2016, Mr. Mayhew went to sick call for chronic back pain because his medication regimen was not relieving him. Provider Monica Mills increased his Gabapentin prescription to 600 mg and his Tramadol prescription from 50 mg BID to 100 mg daily. She also increased his daily Motrin dose from 600 mg to 800 mg.

253.  Two months later, on May 31, 2016, Mr. Mayhew had a neurosurgery consultation because his chronic pain was getting worse. Dr. Mills assessed Mr. Mayhew's Grade 2 spondylolisthesis. He submitted a consult for surgical repair of L5/S1. He also recommended an increase in Mr. Mayhew's Tramadol ER 200 mg daily and Gabapentin to 600 mg twice a day.

254.  On July 20, 2016, Mr. Mayhew had a follow up to his neurosurgery consultation with Defendant Miller. He stated that Gabapentin, Tramadol, and Ibuprofen are ineffective for managing his pain. He stated he only feels relief from the pain when he is sleeping. Defendant Miller discontinued Tramadol and Gabapentin and started Nortriptyline 10 mg and Oxycontin 10

mg every evening. Miller noted Mr. Mayhew was pending surgical repair for Grade 2 Spondylolisthesis. At his next visit with Miller on July 29, 2016, his Oxycontin 10 mg was increased to twice a day.

255.   Mr. Mayhew received a transforaminal lumbar interbody fusion of L5/S1, on August 1, 2016, however, despite the surgery he continued to suffer from pain symptoms and neuropathy.

256.   On January 30, 2017, Mr. Mayhew went to sick call for pain management. He complained of lower back pain and numbness in his right leg. He stated that his Tramadol ER 100 mg prescription was not treating his pain. Michael Kuczmarski, MD, assessed him and increased his Tramadol ER prescription to 200 mg and continued his physical therapy plan.

257.   On April 14, 2017, Kathleen Gustafson examined Mr. Mayhew, who was complaining of continued pain post lumbar fusion. She discontinued Gabapentin, increased Celebrex to 200mg twice daily, and continued Tramadol ER 100 mg.

258.   On December 27, 2017, Mr. Mayhew reported the chronic pain in his back was uncontrolled. Defendant Reinette examined him and wrote in a Progress Note, "patient is currently above the daily allowed dose for his Tramadol ER. Patient is receiving 200 mg BID – making a total of 400 mg/24 hours." He wrote that he had to decrease Mr. Mayhew's Tramadol to 200 mg ER in the morning and 100 mg ER in the evening. He also increased his Lyrica prescription to 200 mg BID.

259.   On December 20, 2018, Mr. Mayhew went to sick call for pain management. He reported his neuropathy was not well controlled since his Tramadol was decreased. Monica Mills wrote that there was no indication for increase in medication at this time and that tapering down his Tramadol prescription would be discussed in the next visit.

260. Throughout late 2019, Defendant Heresniak decreased Mr. Mayhew's pain medications, most notably the Lyrica that was treating Mr. Mayhew's neuropathy. On December 26, 2019 Defendant Heresniak noted, "p[atient] was on tramadol and lyrica, tramadol was discontinued during initiative to eliminate narcotics, Lyrica was also weaned."

261. Mr. Mayhew continued to suffer until he was sent out to see neurosurgeon, Dr. Amit Goyal, who recommended reinstatement of Mr. Mayhew's Lyrica prescription at 150 mg BID and Tramadol ER once per day. Defendants only reinstated the Lyrica.

262. Mr. Mayhew unnecessarily suffered due to the Policy without individualized assessment of his needs.

263. **JAMES MCCARDELL** ("Mr. McCardell") is a 46-year-old inmate who is currently housed at JTVCC.

264. Mr. McCardell has various medical and mental health issues. He is a Type I diabetic and insulin dependent. Mr. McCardell has endured chronic back pain for years and suffers from bilateral spondylosis with resulting anterolisthesis and degenerative disc disease.

265. In December 2015, Mr. McCardell suffered a gunshot wound to the abdomen requiring extensive surgery. Mr. McCardell sustained multiple injuries to the bladder and urethra, which required placement of an indwelling suprapubic catheter. In addition, the gunshot damaged his colon. Mr. McCardell underwent a colostomy during which the left lower quadrant of his colon was removed, and he was left with a colostomy bag.

266. In January 2016, Mr. McCardell had severe post-surgical complications involving an acute embolism and thrombosis as well as sepsis with MRSA.

267. Mr. McCardell received pain medications in the weeks following his surgeries, but by March 2017 was taking only 650mg of Tylenol twice daily.

268.    Throughout 2016 and 2017, Mr. McCardell consistently complained of abdominal pain and began experiencing bladder spasms as well. He also suffered recurring urinary tract infections due to the suprapubic catheter, which further exacerbated his symptoms.

269.    On January 8, 2018, Mr. McCardell was assessed by Defendant Miller and reported a substantial increase in abdominal pain that was difficult to tolerate. Miller ordered 300mg of Gabapentin three times daily for his abdominal pain.

270.    On February 14, 2018, Mr. McCardell again saw Defendant Miller and reported severe pain that felt "like an octopus is trying to rip him up from the inside out." He also reported worsening spasms and a burning sensation in his bladder. At that time, Miller wrote additional orders to start 50mg of Tramadol three times daily as well as 10mg of Baclofen three times daily as needed.

271.    Mr. McCardell's pain persisted, and by March 28, 2018, Miller increased his medications to 100mg of Tramadol ER twice daily and 600mg of Gabapentin three times daily.

272.    Throughout the remainder of 2018, Mr. McCardell continuously reported severe pain and suffered numerous urinary tract infections. During that time and through early 2019, Mr. McCardell received various dosages of Tramadol, Gabapentin, and Baclofen which certainly helped, but did not alleviate his suffering.

273.    In September 2019, Mr. McCardell was doing generally well. He had fewer complaints of severe pain and was having decent relief with 600mg of Gabapentin three times daily, 50mg and 100mg of Tramadol ER in the morning and evening, respectively, and 20mg of Baclofen twice daily.

274.    On October 19, 2019, Mr. McCardell was seen by Defendant McAfee-Garner. She explained the Pain Management Initiative and noted that Tramadol may be habit-forming and was

not recommended for long term use in DDOC. Accordingly, she began tapering and then discontinued Tramadol. Defendant McAfee-Garner also noted that Mr. McCardell's Gabapentin prescription would be evaluated after the Tramadol was discontinued.

275.    Almost immediately thereafter, Mr. McCardell began reporting increased back and abdominal pain. Throughout 2020, without his Tramadol prescription, Mr. McCardell frequently reported pain and burning sensations in his abdomen.  His Gabapentin prescription was also discontinued without the prescription of effective alternatives.

276.    In September of 2020, Mr. McCardell was seen by Dr. Giberson, a trauma surgeon at Christiana Care, who recommended the represcription of Gabapentin and Flexeril which were finally reinstated by Defendants.  Mr. McCardell needlessly suffered for almost a year due to the discontinuation of his effective medical treatment due to nothing more than a policy.

277.    **JEFFERY MCCRAY** ("Mr. McCray") is a 63-year-old inmate who is currently housed at JTVCC.

278.    Mr. McCray suffers from Hypertension, neck pain, headaches, osteoarthritis, neuropathy, and long-term skin ailments. Mr. McCray is wheelchair-bound.

279.    In order to manage his pain, Mr. McCray was prescribed Gabapentin in July 2019. As of October 2019, Mr. McCray was taking Gabapentin 800 mg three times daily and Ibuprofen 800 mg twice daily in order to manage his pain.

280.    On November 9, 2019, shortly after the policy went into effect, Mr. McCray was seen by Defendant McAfee-Garner. In the progress notes, she indicated that Mr. McCray would be tapered off of his dose of Gabapentin, and it would be discontinued. She wrote that this medication was "not recommended for chronic pain" which was not true.

281.   On June 30, 2020, Mr. McCray was seen by Provider Jordan Cunningham for wound care to his right leg. Mr. McCray inquired about being taken off of his Gabapentin during "facility-wide discontinuation." Mr. McCray reported consistent neuropathic pain in his lower extremities that worsened at night. As a result, Mr. McCray was put on Cymbalta 30 mg daily for a week to help him fall asleep.

282.   Mr. McCray suffered terribly due to the discontinuation of his effective treatment due to the Policy.

283.   **GARY PALMER** ("Mr. Palmer") is a 70-year-old inmate who is currently housed at JTVCC.

284.   Mr. Palmer suffers from chronic obstructive pulmonary disease ("COPD"), hypothyroidism, sciatica, and chronic pain in his lower extremities as well as his hands.

285.   As of 2017 Mr. Palmer was prescribed Tramadol and Lyrica to alleviate his chronic pain symptoms.

286.   Defendant Reinette attempted to taper Mr. Palmer's medications due to concerns about seizures, but indicated on January 25, 2019, that the tapers of Mr. Palmer's medication made Mr. Palmer's daily living too difficult.

287.   He also noted he would increase Mr. Palmer's Lyrica in hopes that "the next attempt to taper [off Tramadol] will not feel that brutal for the patient."

288.   On April 4, 2019, Mr. Palmer indicated that he was in severe pain and requested Lyrica to be taken off his medication regimen and his Tramadol prescription to be increased from 100 mg to 200 mg BID.

289.    On July 12, 2019, Mr. Palmer complained to a provider that his Tramadol 200 mg had been unexpectedly reduced to 100 mg. He stated that the previous regimen of Tramadol was effective and his medication was altered without any explanation.

290.    On October 18, 2019 Defendant Adah noted Mr. Palmer's chronic pain syndrome and that Defendant Heresniak planned to wean his medications.

291.    On October 26, 2019, Mr. Palmer complained to Defendant McAfee-Garner of pain all over his body causing him to shake. Defendant McAfee-Garner included the oft-repeated blurb about the Pain Management Initiative.

292.    On November 19, 2019, Defendant Denkins noted, "[patient] is disturbed and states he needs his pain medication and is in compliance with his medications.  Has sought legal counsel and feels this process of taking people in true pain off of all meds is just wrong."  In response, Defendant Denkins did nothing.

293.    On December 20, 2019, Mr. Palmer, no longer on Tramadol, stated that his pain was "10 out of 10." Despite Mr. Palmer's distress his healthcare provider noted his pain as "bothersome" and his reaction as "adjusting to reduction of his pain meds" and prescribed him Prednisone.

294.    On March 12, 2020, Mr. Palmer reported that he has not been well since the discontinuation of his pain medications and he was now experiencing muscle spasms in conjunction with his severe pain. Mr. Palmer was prescribed Baclofen and was told to continue taking Ibuprofen 600 mg. Additionally he was encouraged to try alternative methods to handle his severe pain such as "distraction" and yoga.

295.    These alternatives were not effective.  Mr. Palmer unnecessarily suffered under the Policy.

296. **RICHARD PANDISCIO** ("Mr. Pandiscio") is a 75-year-old inmate who is currently housed at JTVCC.

297. Mr. Pandiscio suffers from cervical radiculopathy, neuropathy, rheumatoid arthritis and chronic pain syndrome. The severity of his neuropathy has required him to use a wheelchair for over 30 years.

298. As of January 29, 2016, Mr. Pandiscio's Chronic Care Clinic progress notes indicate he was prescribed the following medications to manage his chronic pain symptoms: Baclofen, Gabapentin, Tylenol, and Salsalate.

299. Mr. Pandiscio would remain effectively treated with Gabapentin and Baclofen by his providers until the end of 2019.

300. On October 30, 2019, Defendant Atangcho informed Mr. Pandiscio that she was ordering his Gabapentin to be tapered and then discontinued. Defendant Atangcho noted that Mr. Pandiscio was upset at this change and concerned about what would replace these medications. Mr. Pandiscio was offered non-pharmacologic strategies to help cope with his severe neuropathy such as deep breathing and distraction. He was also offered Bengay patches.

301. On November 10, 2019, Mr. Pandiscio was seen by Defendant McAfee-Garner. Mr. Pandiscio pleaded for the return of his medications explaining the increased pain he had been experiencing since the discontinuation. He stated, "Gabapentin was working. Why did we have to mess with that?" After the consultation, Defendant McAfee-Garner not only continued the tapering of Gabapentin, she also ordered the discontinuation of his Baclofen citing the Pain Medication Initiative.

302.    On November 26, 2019, Mr. Pandiscio challenged his medication discontinuation. The same day, he was prescribed 400 mg of Gabapentin and Baclofen by Defendant Heresniak until he could review his situation.

303.    On December 27, 2019, Defendant Heresniak completed his review and decided to discontinue Mr. Pandiscio from his Gabapentin completely.  Defendant Heresniak did not order any diagnostics or other individualized assessments to confirm Mr. Pandiscio's neuropathy.  It is also not clear that Defendant Heresniak even physically examined Mr. Pandiscio.

304.    On March 12, 2020, Mr. Pandiscio was seen by a medical provider. He reported that was suffering and that his old regimen of Gabapentin and Baclofen made his pain tolerable. As a result, his Baclofen was increased to a 30 mg dosage along with Acetaminophen. Gabapentin was not added, nor were other effective alternatives trialed.

305.    On August 22, 2020, Mr. Pandiscio again complained about his severe pain, neuropathy, and numbness in his legs.    Defendant McAfee-Garner agreed to prescribe him Lyrica. Mr. Pandiscio unnecessarily suffered when his effective medications were discontinued due to the policy.

306.    **STEPHEN PARSONS** ("Mr. Parsons") is a 33-year-old inmate who is currently housed at JTVCC.

307.    Mr. Parsons suffers from hypertension and avascular necrosis which causes chronic pain in his left hip.

308.    Mr. Parsons has been taking Tramadol to relieve his chronic pain symptoms since at least 2017.

309.    On December 8, 2017, Mr. Parsons was notified that his prescription of Tramadol may be affecting his mental health medications and was set to try another viable option for pain management.  He was prescribed Gabapentin.

310.    On January 29, 2018, Mr. Parsons returned after undergoing total hip replacement surgery.  His provider added Oxycodone IR 5 mg, and Celebrex 200 mg to his Gabapentin prescription.

311.    In February of 2018, Mr. Parsons was discontinued from Oxycodone and switched back to a Tramadol prescription, which along with Gabapentin was effective in controlling his pain.

312.    In March of 2018, Mr. Parsons reported that he felt "alright now."  Providers continued to prescribe Mr. Parsons Tramadol and Gabapentin until October 2019.

313.    On October 20, 2019, Defendant McAfee-Garner ordered the discontinuation of Mr. Parsons' Tramadol prescription citing the Pain Management Initiative.

314.    Weeks later, on November 9, 2019, Defendant McAfee-Garner further ordered the discontinuation of Mr. Parsons' Gabapentin prescription again citing the Pain Management Initiative.  During this appointment, a frustrated Mr. Parsons stated to Defendant McAfee-Garner that the Gabapentin was not working since the Tramadol was stopped.  It was the combination that had controlled his chronic pain.

315.    Following the discontinuation of Mr. Parsons' pain medication, he reported his pain increased and his ability to stay mobile and participate in daily living decreased; he also could no longer sleep through the night.

316.    **JOHN TAYLOR** ("Mr. Taylor") is a 63-year-old inmate who is currently housed at JTVCC.

317.    Mr. Taylor suffers from HIV and HIV-associated neuropathy. Around July of 2015, Mr. Taylor was prescribed Lyrica to treat and manage his neuropathic pain.

318.    On August 6, 2017, a provider increased Mr. Taylor's Lyrica prescription to 100 mg three times a day to provide better pain control.  His dosage of Lyrica would progressively increase throughout 2018 to help manage his chronic neuropathic pain.

319.    In September of 2019, Mr. Taylor was being administered Lyrica 200 mg three times per day which was documented to provide "good control" of his neuropathic pain.

320.    On November 9, 2019, despite years of effective treatment, Defendant McAfee-Garner ordered the tapering and discontinuation of Mr. Taylor's Lyrica prescription citing the Pain Management Initiative. Defendant McAfee-Garner prescribed no effective alternative medication.

321.    On February 5, 2020, Mr. Taylor was seen by a provider. He complained of worsening chronic pain in his right foot. Mr. Taylor was informed that his Lyrica prescription would not be resumed and he was provided Tylenol.

322.    On May 15, 2020, Mr. Taylor indicated that his feet were in pain that he was unable to take Motrin due to his liver.

323.    As of September 9, 2020, Mr. Taylor's progress notes indicate that he received only Tylenol and that his pain and his HIV related neuropathy remained uncontrolled and unmanaged due to the Policy.  Defendants trialed no effective alternatives.

324.    **ADAM WENZKE** ("Mr. Wenzke") is a 53-year-old inmate who is currently housed at JTVCC.

325.    Mr. Wenzke suffers from sciatica, degenerative disc disease, disc bulging and neurological pain stemming from both his shoulders and lower back.

326.    Progress notes from February 2015 indicate that Mr. Wenzke was treated for his shoulder pain and was awaiting surgery. Mr. Wenzke noted that his left shoulder pain stemmed from an injury sustained while weightlifting in December of 2016 and that it progressively worsened over time.

327.    Mr. Wenzke was seen in May 2018 and indicated to Dr. Adrian Harewood that neither Tylenol nor Motrin remedied his chronic pain. Mr. Wenzke also indicated that he stretched frequently but that stretching was not effective.   He reported pain of 8/10 which constantly throbbed.

328.    On October 28, 2018, Mr. Wenzke began a new prescription of Gabapentin 600 mg twice daily which was effective in treating and controlling his chronic pain.

329.    Mr. Wenzke also was placed on a physical therapy regimen around this time.

330.    On November 11, 2019, Defendant McAfee-Garner ordered the tapering and discontinuation of Mr. Wentke's Gabapentin prescription citing the Pain Management Initiative. Defendant McAfee-Garner ordered no alternative medications for him and only recommended Tai Chi and stretching to treat his pain.

331.    Predictably, following discontinuation of his effective treatment, Mr. Wenzke's pain increased and became intolerable.   On June 29, 2020, Mr. Wenzke complained about his right shoulder pain. He stated the severity now was a 9/10 and that he was unable to sleep due to the pain.

332.   As of July 20, 2020, Mr. Wenzke received only Ibuprofen to treat his pain which was ineffective.  Mr. Wenzke continues to suffer because of the Policy.

333.   **FRANK WHALEN, JR.** ("Mr. Whalen") is a 64-year-old inmate who is currently housed at JTVCC.

334.   Mr. Whalen suffers from chronic pain in his lower back caused by multilevel degenerative disc disease; he also suffers from neuropathy. To manage his pain, Mr. Whalen was prescribed Gabapentin 900 mg three times a day in 2015. His prescription was changed to 1200 mg twice a day. He remained on this dosage for the next 3 years to control his neuropathic pain.

335.   In January of 2019, Tramadol was added to his pain management prescriptions to treat increased back pain.  His provider noted that he should remain on Tramadol until he can be scheduled to receive a blockade treatment.

336.   In April of 2019, Pharmacist Tenielle Watkins recommended increasing Mr. Whalen's dose/frequency of Gabapentin due to current renal function and increasing his Tramadol dosage to the maximum daily dose of 300 mg.  His Tramadol dosage was noted to have been increased in accordance with the recommendation.

337.   In September of 2019, Mr. Whalen informed Defendant Ngwa that his pain medication was working well and requested it not to be changed.  Defendant Ngwa informed Mr. Whalen that the Tramadol would no longer be on the "preferred list according to Pharmacy" and he would be discontinued from that medication.

338.   On October 20, 2019, Defendant McAfee-Garner ordered the tapering and discontinuation of Mr. Whalen's Tramadol prescription citing the Pain Management Initiative.

339.   On November 9, 2019, Defendant McAfee-Garner further ordered the tapering and discontinuation of Mr. Whalen's Gabapentin prescription that had been effectively controlling his

neuropathic pain for years. Defendant McAfee-Garner again cited the Pain Management Initiative for discontinuing this effective treatment. Mr. Whalen complained at this appointment, "[y]ou cannot keep taking the pain medications away and not do anything."

340.    A week later, on November 16, 2019, Mr. Whalen attended sick call and voiced concern that the Gabapentin taper was detrimental; he reported a sharp and shooting pain down his leg.

341.    The progress notes of Mr. Whalen's chronic care consult on December 13, 2019, stated that he continued to complain about his Gabapentin being discontinued and that he needed his medication.

342.    On June 30, 2020, Mr. Whalen was seen for a sick call referral about his back pain. He stated that his back pain was not controlled and that he had difficulties getting up and walking due to the pain. He once again requested the prescription of Gabapentin. Defendant Adah informed Mr. Whalen that Gabapentin "was not an option." Mr. Whalen has suffered unnecessarily since discontinuation of his effective treatment.

343.    **ROBERT WORLEY** ("Mr. Worley") is a 54-year-old inmate currently housed at JTVCC.

344.    Mr. Worley suffers from chronic pain stemming from diabetic neuropathy.

345.    In order to manage his chronic pain, a provider prescribed Gabapentin 600 mg around January 2016 to Mr. Worley. In May 2016 his prescription was increased to 1200 mg, and in June 2016 his prescription was increased to 1800 mg.

346.    At a sick call on September 20, 2016, Mr. Worley stated that his current treatment plan of Gabapentin and Tramadol had helped manage his pain.

347.    A week later, Mr. Worley's Gabapentin prescription was discontinued due to concerns of elevated levels of creatine. His new pain management plan consisted of Tramadol ER and Elavil.

348.    On August 9, 2017, Mr. Worley was prescribed Lyrica 75 mg along with his current dosage of Tramadol 100 mg to help manage his chronic pain.

349.    On September 27, 2017, Mr. Worley requested an increase of his Lyrica prescription. He complained of severe pain and numbness in his left arm.

350.    On March 28, 2018, his Lyrica dosage was increased to 100 mg to control his pain while his Tramadol prescription was ordered to be tapered down.

351.    On April 9, 2018, it was reported that Mr. Worley was not getting his Lyrica prescription and medical staff gave him a 1-time dose of Norco to treat his pain because he was cold to touch and diaphoretic.

352.    On April 30, 2018, his dosage of Lyrica was increased to 150mg.

353.    In May of 2018, Mr. Worley requested to stop Lyrica and restart Gabapentin as that medication was more effective.

354.    In November of 2018, Mr. Worley was placed back on Gabapentin 600 mg.

355.    Mr. Worley was seen by medical staff on February 14, 2019 and complained of persistent pain in his hands. His Gabapentin prescription was increased to 1200 mg and then to 1600 mg in March 2019.

356.    On September 1, 2020, Defendant Denkins ordered Mr. Worley's Gabapentin medication tapered and discontinued without any medical justification or reasoning noted.

357.    After the discontinuation, Mr. Worley received only Elavil which was ineffective.

358.    On October 6, 2020, Mr. Worley described the increase in his neuropathic pain as throbbing and constant and negatively impacting his activities of daily living.

359.    **JOSEPH WALLS** ("Mr. Walls") is a 68-year-old United States military veteran currently housed at JTVCC.

360.    Mr. Walls suffers from abdominal and scrotal pain stemming from myriad ailments. His diagnoses include a right inguinal hernia, arthritis, cirrhosis, hepatitis C, and chronic pain.

361.    On June 24, 2018, Mr. Walls reported constant pain and that Tylenol was not managing his pain. Mr. Walls was prescribed Tramadol 50 mg.

362.    On July 19, 2018, Mr. Walls was seen at sick call where he continued to report excruciating pain. A provider added Gabapentin 400 mg to his Tramadol prescription.

363.    In December 2018, Mr. Walls underwent left inguinal hernia repair surgery.

364.    In January 2019, Defendant Ngwa along with Defendant Miller discontinued Mr. Wall's Tramadol prescription stating, "Patent does not qualifies (sic) for Tramadol prescription at this time."

365.    On February 21, 2019, Mr. Walls reported persistent pain since the discontinuation of Tramadol and that Tramadol had managed the symptoms.  At this time, DDOC providers prescribed Gabapentin 400 mg, Tylenol 650 mg, and Naproxen 1000 mg.

366.    In November of 2019, Mr. Walls was seen by Defendant Sheri McAfee-Garner. Defendant McAfee-Garner informed Mr. Wall of the Pain Management Initiative and that he was to be tapered off and discontinued from his Gabapentin prescription.

367.    On March 19, 2020, Mr. Walls was seen by Defendant Ngwa. He stated that he was taking Celebrex but needed something stronger to manage his pain. Mr. Walls specifically

requested to be put back on Tramadol or Gabapentin because they effectively treated his pain. Defendant Ngwa did not prescribe the medication nor effective alternatives.

368.    Defendant Ngwa's progress notes only indicate that Mr. Walls' Celebrex prescription was discontinued due to his family history of heart disease and that he was prescribed Tylenol 500 mg TID as needed. Defendant Ngwa noted that there was no medical indication for Tramadol or Gabapentin but that the provider would defer to the Medical Director for review. Mr. Walls' records do not indicate that any such review took place.

369.    Since the discontinuation of his Gabapentin prescription and Tramadol, Mr. Walls has reported sleeping only 3-4 hours at night due to his uncontrolled pain.

## The Purported Plaintiff Class Members

370.    Plaintiffs bring this lawsuit pursuant to Federal Rules of Civil Procedure 23(b)(1) -(b)(3) and 23(c)(4) on behalf of themselves and all present and future patients in the care of DDOC who require effective treatment for chronic pain issues.

371.    The allegations and claims of the representative plaintiffs are typical of the claims of the proposed plaintiff class.

372.    The plaintiff class is so numerous that joinder of all members is impractical; to date Plaintiffs' counsel has identified at least 106 victims of the Policy, but there are more.

373.    The exact size of the class is unknown because the patient population in Defendant DDOC's facilities are continuously changing. The number of patients is, however, sufficiently large enough as to render joinder of all class members impracticable.

374.    Joining all patients who require medical treatment with the medications targeted by the Policy would be further impractical because many of the patients are physically and/or sensorially disabled and, thus, requiring each and every one to participate individually in the

litigation, rather than through the representative process of a class action, would cause a needless and enormous drain on State and Court resources.

375.    The policies, practices, omissions, and conditions that form the basis of the complaint are common to all members and the relief sought will apply to the entire class.

376.    The claims of the Plaintiffs are typical and are not in conflict with the interests and claims of the Class as a whole.  All members of the Class are similarly affected by the Defendants' allegedly wrongful conduct as complained of herein.

377.    Each of the individuals within the plaintiff class require treatment for chronic pain or neurological conditions with medications Defendants deemed to have abuse potential, although the specific medical conditions, injuries and neuropathic ailments may differ patient to patient.

378.    But for the Policy, plaintiff class members would have continued to receive treatment with effective medications.

379.    Each of the class members has complained or grieved or will complain or grieve the fact that he or she is suffering from unnecessary pain as a result of the refusal to prescribe or the discontinuation of medications Defendants deemed to have abuse potential.

380.    There are questions of law and fact common to the members of the Class, including whether Defendants have violated class members' rights to be free from cruel and inhumane treatment as secured by the Eighth Amendment.

381.    The Plaintiffs' interests are co-extensive and not in conflict with those of the Class. The Plaintiffs are capable of fairly and adequately representing the Class and protecting its interests.

382.    The Plaintiffs and the proposed Class are represented by Jacobs & Crumplar,

P.A. and The Law Office of Amy Jane Agnew, P.C. Plaintiffs' counsel has extensive experience prosecuting class actions and prisoner's rights litigation and will adequately represent the Class.

## FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983**
***Deliberate Indifference to Health or Safety – Policy Implementation and Enforcement***
***(Against Centurian of Delaware, LLC and Correct RX Pharmacy Services, Inc.)***

383.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

384.    In late 2019, Defendant Connections and DDOC promulgated the Pain Management Initiative.

385.    Though the policy is not facially unconstitutional, its application and enforcement demanded that Defendants abruptly discontinued patients' effective medical treatment without individualized assessments of efficacy or patient need.

386.    The denial or discontinuations of medications took place even when necessary diagnostic testing had not been arranged or conducted.

387.    The denials or discontinuations of medications took place even when effective alternative treatments have not been prescribed or identified.

388.    Enforcement of the Pain Management Initiative stripped patients of constitutionally mandated individualized treatment.

389.    Plaintiffs suffered severely and unnecessarily due to Defendants' Pain Management Initiative.

390.    After April of 2020, Defendant Centurian took over the contract for medical services delivery within DDOC from Connections.

391.    Centurian maintained most of the same employees and did not rescind the Pain

Management Initiative despite the fulsome evidence that it was harming patients and its obvious deviations from the standard of care.

392.    Centurian's employees, including Defendant providers, continued to discontinue effective medical treatment due to the Policy without identifying or trialing effective alternatives.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 - *Deliberate Indifference to Medical Needs*
*(Against Defendants Monroe Hudson in his official capacity, Michael Records in his official capacity, Awele Mduka-Ezeh in her official capacity, Sheri L. McAfee-Garner in her individual capacity, Victor a Heresniak in his individual capacity, Emilia Adah in her individual capacity, Charles Reinette in his individual capacity, Flora A. Atangcho in her individual capacity, Barbara Denkins in her individual capacity, Carla Miller in her individual capacity, William F. Ngwa in his individual capacity, Feeah M. Stewart in her individual capacity and Jane or John Does 1-50.)*

393.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

394.    Defendant providers discontinued Plaintiffs' effective medical treatment without individualized assessments of need or efficacy.

395.    Often, Defendant providers failed to prescribe effective alternatives, opting instead to trial psychiatric medications, such as Cymbalta and Elavil which caused intolerable side effects, or OTC medications that had already proven ineffective.

396.    When these alternative treatments failed providers ignored Plaintiffs' pleas for the reinstatement of their effective treatment.

397.    Plaintiffs suffer severely and unnecessarily due to the discontinuation of their effective medical treatment due to nothing more than a policy.

**PRAYERS FOR RELIEF**

**WHEREFORE,** Plaintiffs request that the Court grant the following relief:

398.    Certifying this action as a class action under Fed. R. Civ. P. 23(b)(1)-(3) and (c)(4).

399.    Adjudging and declaring that the policy, practice, omission, and conditions described above are in violation of the rights of the Plaintiffs and members of the Class as secured by the Eighth Amendment.

400.    Permanently enjoining Defendants, their agents, employees, and all persons acting in concert with them from subjecting Plaintiffs and the members of the Class to the illegal policy, practices, omissions, and conditions described above.

401.    Directing Defendants to immediately arrange individualized assessments of class members' medical needs based on a medically appropriate review of the patient's medical history, physical examination, consideration of real function; and where those efforts fail, ordering assessment by a properly certified, independent pain management specialist; and, creating a monitoring person or body to ensure that patients who require medications are not denied based on anything other than a comprehensive individualized assessment.

402.    Awarding compensatory damages for the pain and suffering of Plaintiffs and members of the Class;

403.    Awarding Plaintiffs reasonable attorneys' fees, costs, disbursements and other litigation expenses, pursuant to 42 U.S.C. § 1988;

404.    Retaining jurisdiction over this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future.

405.    Ordering such other and further relief as the Court may deem just and proper.


Dated:          July 12, 2022
                Wilmington, Delaware


                                        **JACOBS & CRUMPLAR, P.A.**

                                        By:____/s/Raeann Warner___
                                        Raeann Warner, Esq. (DE Bar #4931)
                                        *Counsel for Plaintiffs and Putative Class*
                                        750 Shipyard Drive, Suite 200
                                        Wilmington, Delaware 19801
                                        raeann@jcdelaw.com
                                        (302) 656-5445


                                        **LAW OFFICE OF AMY JANE AGNEW, P.C.**


                                        Amy Jane Agnew, Esq.
                                        Joshua Morrison, Esq.
                                        *Pending Pro Hac Vice Admission*
                                        *Counsel for Plaintiffs and Putative Class*
                                        24 Fifth Avenue, Suite 1701
                                        New York, New York 10011
                                        aj@ajagnew.com
                                        (973) 600-1724